UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------
M&B PROPERTIES 3 BUSHEY LANE VT, LLC,
M&B PROPERTIES 6 LEE BOULEVARD PA,
L.P. and M&B PROPERTIES 2729 PATTERSON
STREET NC, LLC,                                          Civil Action No.:

                              Plaintiff,
                                                         **COMPLAINT**

            -against-

                                                         **JURY TRIAL DEMANDED**
CWCAPITAL ASSET MANAGEMENT LLC,
WELLS FARGO, N.A. and U.S. BANK NATIONAL
ASSOCIATION, in its capacity as Trustee, Successor-
In-Interest to Bank of America, N.A., as Trustee,
Successor to Wells Fargo Bank, N.A., as Trustee for the
Registered Lenders of Wachovia Bank Commercial
Mortgage Trust, Commercial Mortgage Pass-Through
Certificates, Series 2007-C32,

                              Defendants.
-------------------------------------------------------------------

        Plaintiffs M&B Properties 3 Bushey Lane VT, LLC, M&B Properties 6 Lee Boulevard

PA, L.P and M&B Properties 2729 Patterson Street NC, LLC (collectively, "Plaintiffs" and each

a "Plaintiff"), as and for their verified complaint herein, through their attorneys, Westerman Ball

Ederer Miller Zucker & Sharfstein, LLP, state to the Court as follows:

                              **NATURE OF ACTION**

        1.      In 2007, Plaintiffs took out three loans from Wachovia Bank in order to acquire

three parcels of real property.  The loans were negotiated together, and the applicable loan

documents were signed at the same time and contain substantially the same provisions.

        2.      Defendant U.S. Bank National Association took an assignment of Wachovia's

interest in the loans.  The remaining Defendants are the entities that served as the master servicer

and the special servicer for the loans. The loans have been paid in full. In fact, as described below, Plaintiffs have overpaid due to Defendants' wrongful and fraudulent conduct.

3.     Defendants induced Plaintiffs to forego paying off the loans on the April 11, 2017 maturity date (which Plaintiffs were otherwise ready, willing and able to do) so that the parties could continue negotiating a refinance of the loans. Then, several weeks later, contrary to the parties' agreement and Defendants' representations, Defendants asserted that the failure to pay off the loans on the maturity date was a breach of the applicable loan documents.

4.     Even worse, in an effort to defraud Plaintiffs, Defendants concocted hundreds of thousands of dollars in purported default interest, fees and expenses, and refused to accept a payoff of the loans or to provide satisfactions of the relevant mortgages, unless those baseless charges were paid by Plaintiffs.

5.     Defendants took this position despite their own inability to set forth a consistent narrative regarding the fees and expenses supposedly owed by Plaintiffs. For example, the special servicer provided a payoff statement for one loan which included more than $55,000 in purported fees and expenses that did not appear on a payoff statement for the same loan that the master servicer had provided to Plaintiffs <u>one business day earlier</u>. The special servicer's payoff statements for the other two loans contained similarly baseless fees and expenses.

6.     On July 1, 2017, Plaintiffs paid Defendants the full principal amount of the loans, plus interest owing through the day after the date when Plaintiffs first requested payoff quotes from Defendants and a payoff processing fee.

7.     On July 6, 2017, Plaintiffs filed a prior action against Defendants seeking, among other things, a finding that Plaintiffs had paid the loans in full and an order compelling Defendants to provide satisfactions of the relevant mortgages.

2

8.   The parties engaged in an unsuccessful mediation.  By April 2018, the case was still in the motion to dismiss stage.

9.   Meanwhile, Defendants' refusal to release the liens on the properties was causing significant harm.  Among other things, Plaintiffs were unable to obtain other financing without providing proof that Defendants' loans had been satisfied.  Further, interest rates on commercial mortgages were increasing.

10.  Defendants were informed that their misconduct was causing harm to Plaintiffs and the properties, but they still refused to issue satisfactions.

11.  As a result, in order to avoid further harm, Plaintiffs were forced to pay Defendants the full amount allegedly owing (while reserving their rights to contest those amounts).  Plaintiffs also dismissed the prior action without prejudice because Defendants wrongfully refused to issue satisfactions while Plaintiffs' claims were pending unless Plaintiffs provided security for future legal fees that might be incurred by Defendants (although there was no basis for such a demand in the loan documents or otherwise).

12.  Plaintiffs paid Defendants all amounts allegedly due on April 17, 2018. Defendants' counsel acknowledged receipt of payment in full.  Nonetheless, Defendants did not discharge their liens on the properties until more than six weeks later.

13.  Plaintiffs now seek damages for the harm caused by Defendants' wrongful conduct, including the amount of the additional payments made to Defendants (which were based on improper and baseless charges), damages for the harm caused to Plaintiffs and the properties by Defendants' wrongful refusal to issue satisfactions, and attorneys' fees, costs and expenses incurred by Plaintiffs.

14.     As discussed in greater detail below, Defendants' conduct is outrageous and also warrants the imposition of punitive damages to deter similar conduct in the future.  Plaintiffs have the means and the will to fight back, but other borrowers may not.  Punitive damages are appropriate to send a message to Defendants that this type of outrageous and fraudulent conduct will not be tolerated.

## PARTIES

15.     Plaintiffs are New York limited liability companies with their principal places of business located in Nassau County, New York.

16.     The member of Plaintiff M&B Properties 3 Bushey Lane VT, LLC is M&B Properties, Inc., a New York corporation with its principal place of business in New York.

17.     The partners of Plaintiff M&B Properties 6 Lee Boulevard PA, L.P are M&B Properties, Inc., a New York corporation with its principal place of business in New York, and M&B Properties GP 6 Lee Boulevard, LLC, a New York limited liability company.  The member of M&B Properties GP 6 Lee Boulevard, LLC is M&B Properties, Inc., a New York corporation with its principal place of business in New York.

18.     The member of Plaintiff M&B Properties 2729 Patterson Street NC, LLC is M&B Properties, Inc., a New York corporation with its principal place of business in New York.

19.     Upon information and belief, defendant U.S. Bank National Association, as Trustee, Successor-in-Interest to Bank of America, N.A., as Trustee, Successor to Wells Fargo Bank, N.A., as Trustee for the Registered Lenders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-C32 ("Lender"), is a national banking association with a principal place of business and main office located in Ohio.

4

20.     Upon information and belief, defendant Wells Fargo, N.A. ("Wells") is a national banking association with a principal place of business located in California and a main office located in South Dakota.

21.     Upon information and belief, defendant CWCapital Asset Management LLC ("CW Capital") is a Massachusetts limited liability company with a principal place of business in Bethesda, Maryland, and which has no members who are citizens of New York.

22.     Lender, Wells and CW Capital are referred to collectively herein as "Defendants".

## JURISDICTION AND VENUE

23.     Upon information and belief, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) in that this is an action between citizens of different States. Further, the amount in controversy exceeds $75,000, exclusive of interest and costs.

24.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

25.     The Court has personal jurisdiction over Defendants pursuant to New York's long arm statute, Civil Practice Law and Rules § 302.

## FACTS

### A.  The Loans

26.     In 2007, each Plaintiff took a loan from Wachovia Bank, National Association ("Wachovia") in connection with the purchase of three separate parcels of real property located in Vermont, Pennsylvania and North Carolina.

27.     Upon information and belief, Lender is the successor in interest to Wachovia.

28.     The loan relating to real property in Vermont (the "Vermont Loan") was extended to plaintiff M&B Properties 3 Bushey Lane VT, LLC, in the original principal amount of $1,100,000 pursuant to a promissory note dated March 13, 2007.

29.     The loan relating to real property located in Pennsylvania (the "Pennsylvania Loan") was extended to plaintiff M&B Properties 6 Lee Boulevard PA, L.P., in the original principal amount of $1,860,000, pursuant to a promissory note dated March 13, 2007.

30.     The loan relating to real property located in North Carolina (the "North Carolina Loan") was extended to M&B Properties 2729 Patterson Street NC, LLC, in the original principal amount of $1,120,000, pursuant to a promissory note dated March 13, 2007.

31.     The Vermont Loan, the Pennsylvania Loan and the North Carolina Loan are referred to collectively herein as the "Loans".

32.     The Vermont Loan was secured by a certain mortgage on the real property located at 3 Bushey Lane, Essex, Vermont (the "Vermont Mortgage").

33.     The Pennsylvania Loan was secured by a certain mortgage on the real property located at 6 Lee Boulevard, Malvern, Pennsylvania (the "Pennsylvania Mortgage").

34.     The North Carolina Loan was secured by a certain mortgage on the real property located at 2729 Patterson Street, Greensboro, North Carolina (the "North Carolina Mortgage").

35.     The Vermont Mortgage, the Pennsylvania Mortgage and the North Carolina Mortgage are referred to collectively herein as the "Mortgages".

36.     The parcels of real property secured by the Mortgages are referred to collectively herein as the "Properties".

37.     The promissory notes, Mortgages, and all other agreements, instruments and documents, at any time executed and delivered in connection with the Loans, each as amended, restated, supplemented or otherwise modified from time to time, are referred to collectively herein as the "Loan Documents."

6

**B. The Agreement Between Plaintiffs and Wells**

38.     Wells was Lender's master servicer with respect to the Loans.

39.     Plaintiffs sent payments to Wells and otherwise dealt with Wells as their point of contact with respect to the Loans beginning in late 2008.

40.     Wells is an agent of Lender and had actual authority to make agreements and representations on behalf of Lender with respect to the Loans.

41.     Wells also had apparent authority to make agreements and representations on behalf of Lender with respect to the Loans.

42.     Plaintiffs reasonably believed, based on the actions of Lender, that Wells had authority to act as an agent for Lender.

43.     Plaintiffs reasonably relied on Wells' authority, or the appearance of same, and will suffer harm if an agency relationship between Lender and Wells is not found.

44.     Pursuant to the terms of the Loan Documents, the Loans each had a maturity date of April 11, 2017 (the "Maturity Date").

45.     In October 2016, approximately six months before the Maturity Date, Plaintiffs and Wells entered into negotiations relating to a refinancing of the Loans.

46.     On or about April 6, 2017, Plaintiffs and Wells reached an agreement relating to the Maturity Date and the refinancing of the Loans (the "Agreement").

47.     In reaching the Agreement with Plaintiffs, Wells was acting as an agent of Lender with actual and/or apparent authority to bind Lender.

48.     Pursuant to the Agreement, Wells agreed that Lender would forbear from enforcing the Maturity Date and from calling any default associated with the failure to pay off the Loans in full by the Maturity Date so long as: (i) the parties continued negotiating the terms

7

of a refinancing in good faith and exchanging documents and information relating to same; and (ii) Plaintiffs continued to send in monthly payments of principal and interest beyond the Maturity Date, although such payments were not called for under the Loan Documents.

49.     If not for the Agreement, Plaintiffs would have paid the Loans off in full on or before the Maturity Date.  Plaintiffs were ready, willing and able to do so.

50.     Plaintiffs reasonably relied upon Wells' promises and representations, made on behalf of Lender, that Plaintiffs' failure to pay off the Loans in full by the Maturity Date would not be considered a default under the Loan Documents so long as Plaintiffs complied with their obligations under the Agreement.

51.     Plaintiffs fulfilled all of their obligations under the Agreement.

52.     After the Maturity Date passed on April 11, 2017, each Plaintiff made two separate monthly payments of principal and interest (one in April and one in May) in amounts consistent with the payments being made by each Plaintiff prior to the Maturity Date.

53.     In addition, Plaintiffs also continued negotiating the terms of the refinancing with Wells in good faith and provided requested documents and information.

54.     In the weeks following the Maturity Date, despite being in regular contact with representatives of Plaintiffs, Wells never asserted that Plaintiffs had defaulted under the Loan Documents by failing to pay off the Loans on the Maturity Date or that Plaintiffs had otherwise done anything wrong.

### C. **CW Capital Asserts Wrongfully that Plaintiffs Are in Default**

55.     CW Capital was Lender's special servicer for the Loans.

56.     Like Wells, CW Capital is an agent of Lender.

8

57.     By letters dated May 22, 2017, counsel for CW Capital asserted that Plaintiffs had defaulted by failing to pay off the Loans by the Maturity Date.

58.     When Plaintiffs received the May 22, 2017 letters asserting a default, Plaintiffs believed there had been an honest mistake.  Perhaps Wells and CW Capital had gotten their wires crossed.  Plaintiffs reached out to both companies to inquire as to what had happened.

59.     Unfortunately, it soon became apparent that there was no mistake.  CW Capital insisted that a default had occurred, even after it was repeatedly informed about the Agreement with Wells.  CW Capital refused to acknowledge or to honor the Agreement in any way.

60.     Neither CW Capital nor Wells ever denied the existence of the Agreement.

61.     Rather, CW Capital apparently believed that it was not required to honor the Agreement, even though both CW Capital and Wells are agents of Lender.

62.     Further, CW Capital asserted that default interest and other fees were accruing as a result of the alleged "default" by Plaintiffs.

63.     As soon as Plaintiffs realized that CW Capital intended to pursue the baseless "default", Plaintiffs decided that they would simply pay off the Loans in full.  Plaintiffs had no other choice given CW Capital's wrongful conduct.

64.     Thus, on May 25, 2017, only three days after CW Capital first asserted the baseless "default", a representative of Plaintiffs asked Timothy Johnson of CW Capital to immediately provide appropriate payoff statements for each of the Loans.

65.     Defendants did not provide any payoff statements in response to that request.

66.     Plaintiffs continued to make successive requests for payoff statements on June 1, 2017, June 6, 2017 and on June 7, 2017.

67.     Defendants, again, failed to provide a single payoff statement in response to those requests.

68.     Upon information and belief, Defendants purposely stalled in providing payoff statements to Plaintiffs in order to manufacture a purported basis for charging default interest, fees and expenses and to improperly enrich themselves.

**D.  Defendants Provide Fraudulent Payoff Statements to Plaintiffs**

69.     Additional requests for payoff statements were sent on behalf of Plaintiffs, including requests by the undersigned counsel for Plaintiffs.

70.     On Friday June 9, 2017, Wells finally provided a payoff statement for the North Carolina Loan (the "Wells NC Payoff Statement").

71.     The Wells NC Payoff Statement improperly included ordinary interest for the time period during which Defendants failed and/or refused to provide a payoff quote to Plaintiffs.

72.     The Wells NC Payoff Statement also included $6,419.31 in purported default interest (which is disputed), as well as a $500 payoff processing fee.

73.     On Monday, June 12, 2017 – the very next business day – CW Capital's counsel provided a payoff statement to Plaintiffs for the North Carolina Loan ("the CW Capital NC Payoff Statement").

74.     Undersigned counsel for Plaintiffs did not receive the CW Capital NC Payoff Statement until several days later because CW Capital's attorney sent it to the wrong email address.  Nevertheless, the payoff statement was dated June 12, 2017.

75.     Like the Wells NC Payoff Statement, the CW Capital NC Payoff Statement also included ordinary interest and default interest amounts (which are disputed), as well as the $500 payoff processing fee.

76.     In addition, the CW Capital NC Payoff Statement included a purported "Late Charge (Balloon Payment)" in the amount of $47,355.56 and purported "Lender Expenses" in the amount of $8,332.43.   Neither of those charges was reflected in the Wells NC Payoff Statement.

77.     The CW Capital NC Payoff Statement included more than $55,000 in charges and fees that were not included in the payoff statement provided to Plaintiffs one business day earlier.

78.     On June 12, 2017, CW Capital's attorney also provided payoff statements for the Vermont Loan and the Pennsylvania Loan.   Those payoff statements included similar "late charges" and "lender expenses" to those asserted in the CW Capital NC Payoff Statement.

79.     Wells never provided payoff statements for the Vermont Loan or the Pennsylvania Loan.

### E. Defendants Refuse to Correct the Fraudulent Payoff Statements

80.     Plaintiff's counsel rejected the payoff statements provided and made repeated requests in writing that Defendants provide appropriate payoff statements for the Loans that were consistent with the Agreement.

81.     Among other things, Plaintiff (through counsel) demanded that Defendants provide payoff statements that omitted any default interest, fees, expenses and/or other charges that related to the alleged default asserted by CW Capital.

82.     However, Defendants wrongfully failed and/or refused to provide the requested payoff statements. Further, Defendants insisted, without justification, that the "default" was legitimate and that Plaintiffs were required to pay, among other things, the default interest, fees and expenses reflected on the payoff statements provided by CW Capital.

83.     Defendants never attempted to explain the blatant discrepancies between the Wells NC Payoff Statement and the CW Capital NC Payoff Statement, as described above.

84.     Further, Defendants failed to justify or substantiate the exorbitant "late charges" and "lender expenses" reflected on the payoff statements provided by CW Capital.

**F.   Plaintiffs Pay the Amounts Actually Due and Owing on July 1, 2017**

85.     On July 1, 2017, Plaintiffs paid the following amounts to Lender via wire transfer: (i) $924,228.85 with respect to the Vermont Loan; (ii) $1,567,183.15 with respect to the Pennsylvania Loan; and (iii) $941,022.74 with respect to the North Carolina Loan (collectively, the "Payments").

86.     With respect to each Loan, the Payments represent the sum of:  (i) the full outstanding principal balance; (ii) all accrued ordinary interest through May 26, 2017; and (iii) the $500 payoff processing fee reflected on the payoff statements provided by Defendants.

87.     Thus, the Payments represent payment in full of all amounts justly due and owing Lender under the Loan Documents.

88.     In computing the amount of the Payments, ordinary interest was calculated through May 26, 2017, because that is the day after Plaintiffs made their initial request to Defendants for the issuance of payoff statements. Had Defendants provided appropriate and accurate payoff statements to Plaintiffs in a timely fashion, Plaintiffs would have paid the Loans in full by that date.

12

89.     Accordingly, Plaintiffs satisfied their obligations under the Loan Documents and the Agreement.   Nonetheless, despite due demand, Defendants wrongfully refused to issue satisfactions of the Mortgages reflecting that payment in full has been received.

### G.  The Prior Action

90.      On or about July 6, 2017, Plaintiffs commenced an action in this Court (Case No. 2:17-cv-04007-JMA-SIL) against Defendants seeking, among other things, a declaration that the Payments satisfied Plaintiffs' obligations under the Loan Documents and directing Defendants to issue satisfactions of the Mortgages.

91.     In February 2018, the parties and their counsel attended a mediation conducted pursuant to the Court's mediation program.  The mediation was unsuccessful.

92.     For reasons discussed below, Plaintiffs voluntarily dismissed the prior action, without prejudice, on April 11, 2018.

### H.  Plaintiffs Pay All Amounts Allegedly Owing Under Protest

93.     Defendants' refusal to issue satisfactions of the Mortgages was causing significant harm to Plaintiffs and the Properties during the pendency of the prior action.

94.     Among other things, interest rates on commercial loans rose during the time period between July 2017 (when the Payments were made) and March 2018.

95.     Further, in April 2018, interest rates were continuing to rise.

96.     Plaintiffs wished to refinance the loan.  However, Defendants' wrongful refusal to discharge their liens prevented Plaintiffs from closing on such financing.  Not surprisingly, the potential lenders all required the filing of satisfactions of the Mortgages prior to closing on the transaction.

97.     One such potential lender was Defendant Wells.  Wells engaged in discussions with Plaintiffs relating to providing financing for the properties over the course of several weeks. However, Wells eventually refused to go forward with the transaction.

98.     Plaintiffs notified Defendants, through their respective counsel, that Defendants' refusal to issue satisfactions was causing significant harm to Plaintiffs and the Properties.

99.     However, Defendants still failed and/or refused to issue satisfactions.

100.    As a result, in order to obtain satisfactions and avoid further harm, Plaintiffs were forced to pay the full amounts allegedly due and owing Defendants (under protest and subject to a full reservation of Plaintiffs' rights).

101.    Plaintiffs were also forced to dismiss the prior action without prejudice because Defendants refused to issue satisfactions while Plaintiffs' claims were pending unless Plaintiffs would provide security in connection with Defendants' anticipated attorneys' fees to be incurred in defending the prior action.

102.    There is no basis whatsoever in the Loan Documents (or otherwise) for Defendants to insist on receiving security for anticipated future legal fees as a condition to issuing mortgage satisfactions following payment in full of all amounts allegedly due.

103.    Before paying the amounts allegedly due, Plaintiffs requested detailed payoff quotes from Defendants, including a detailed breakdown and explanation of all amounts allegedly owed and appropriate back-up documentation for the fees and expenses charged.

104.    However, Defendants provided summary quotes listing lump-sum charges, without providing any of the requested detail or backup documentation.

105.    For example, Defendants' payoff quote listed $180,806.44 in unpaid "lender expenses" for the three Loans, without breaking down that figure or providing any backup.

106.    After weeks of follow up, Defendants provided a payoff quote on April 12, 2018 that included some additional details about the alleged expenses, fees and interest being charged. For example, that quote made clear that a large portion of the "lender expenses" were made up of legal fees incurred by Defendants' counsel in connection with the parties' legal dispute.

107.    Even apart from the fact that Plaintiffs did not default and had paid off all legitimate charges in July 2017, the fees and expenses charged by Defendants were exorbitant, improper and baseless.

108.    Defendants agreed (through their counsel) that they would release their liens on the Properties upon receipt of payment in full of all amounts allegedly due and owing.

109.    Indeed, the payoff quote issued on April 12, 2018 included a $5,000 charge for "Estimated Cost to Release Liens".

110.    On April 17, 2018, Plaintiffs paid by wire transfer to CW Capital the amount of $404,996.44, subject to a full reservation of Plaintiffs' rights (the "Additional Payment").

111.    The Additional Payment satisfied all amounts allegedly due and owing under the three Loans.

112.    Counsel for Defendants confirmed receipt of the Additional Payment and acknowledged that it satisfied all amounts allegedly due.

113.    Indeed, by email dated April 19, 2018, counsel for Defendants indicated that Plaintiffs had overpaid by $13.45.

114.    Counsel for Defendants also indicated that Defendants would prepare and file appropriate satisfactions of the Mortgages in a timely fashion.

115.    Over the subsequent weeks, counsel for Plaintiffs followed up in writing regarding the satisfactions no fewer than eight separate times.

116. On April 30, 2018, counsel for Defendants indicated in writing that satisfactions would be filed within 7-10 days. However, that did not occur.

117. Following numerous additional requests, Defendants finally discharged the liens on or about May 30, 2018.

118. Defendants' failure to discharge the liens following the Payments made on July 1, 2017 was wrongful, since Plaintiffs paid all amounts justly due and owing at that time. Defendants' failure to discharge the liens for more than six weeks following the Additional Payment made on April 17, 2018 – which indisputably paid *all* amounts allegedly owing – was even worse and was apparently calculated specifically to harm Plaintiffs.

119. Upon information and belief, Defendants failed to discharge the liens because they wanted to tie up the Properties and prevent Plaintiffs from obtaining financing, causing harm to Plaintiffs and the Properties.

### First Cause of Action
### (Breach of the Agreement)

120. Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

121. The Agreement is a valid and binding contract.

122. Plaintiffs duly performed their obligations under the Agreement.

123. Further, Plaintiffs took actions in part performance of the Agreement which were unequivocally referable to the Agreement.

124. Among other things, Plaintiffs did not pay off the Loans in full on or before the Maturity Date, which Plaintiffs were otherwise ready, willing and able to do.

125.    In addition, Plaintiffs also partially performed the Agreement when they made payments of principal and interest after the passing of the Maturity Date which were not called for under the Loan Documents.

126.    Defendants breached the Agreement by, among other things:  (i) asserting that Plaintiffs committed a default by failing to pay off the Loans in full by the Maturity Date; (ii) seeking payment of default interest, fees, attorneys' fees, expenses and other charges associated with the purported default; (iii) refusing to provide appropriate Mortgage satisfactions consistent with the Agreement unless Plaintiffs paid the foregoing improper charges; and (iv) intentionally and/or negligently harming Plaintiffs and the Properties by failing to timely discharge the liens, which prevented Plaintiffs from obtaining financing.

127.    As a direct and proximate result of the foregoing, Plaintiffs have suffered damages which include without limitation:  (i) the amount of the Additional Payment; (ii) additional damages in an amount to be determined at trial; and (iii) interest, costs, expenses and attorneys' fees.

### Second Cause of Action
### (Promissory Estoppel)

128.    Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

129.    In its capacity as an agent of Lender, Wells clearly and unambiguously promised Plaintiffs, among other things, that Lender would not assert a default with respect to Plaintiffs' failure to pay off the Loans in full on or before the Maturity Date.

130.    Plaintiffs reasonably and foreseeably relied on those promises.

131.    In reliance on those promises, Plaintiffs acted to their detriment.

132.    Among other things, Plaintiffs did not pay off the Loans in full on or before the Maturity Date, which Plaintiffs were otherwise ready, willing and able to do.

133.    In addition, Plaintiffs also acted to their detriment when they sent in payments of principal and interest after the passing of the Maturity Date which were not called for under the Loan Documents.

134.    Defendants breached their promises by, among other things:  (i) asserting that Plaintiffs committed a default by failing to pay off the Loans in full by the Maturity Date; (ii) seeking payment of default interest, fees, attorneys' fees, expenses and other charges associated with the purported default; (iii) refusing to provide appropriate Mortgage satisfactions consistent with the Agreement unless Plaintiffs paid the foregoing improper charges; and (iv) intentionally and/or negligently harming Plaintiffs and the Properties by failing to timely discharge the liens, which prevented Plaintiffs from obtaining financing.

135.    As a direct and proximate result of the foregoing, Plaintiffs have suffered damages which include, without limitation:  (i) the amount of the Additional Payment; (ii) additional damages in an amount to be determined at trial; and (iii) interest, costs, expenses and attorneys' fees.

### Third Cause of Action
### (Breach of the Loan Documents)

136.    Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

137.    The Loan Documents are valid and binding contracts.

138.    Plaintiffs duly performed their obligations under the Loan Documents.

139.    The Loan Documents contain an implied covenant that the parties will act in good faith and deal fairly with each other.

140.     Defendants breached the implied covenant of good faith and fair dealing by inducing Plaintiffs to forego paying off the Loans in full on the Maturity Date through false promises and misrepresentations, as described above.

141.     Defendants also breached the implied covenant of good faith and fair dealing by breaching their promises, asserting that a default was committed, and insisting upon the payment of exorbitant default interest, fees and expenses that were not actually due before they would issue satisfactions of the Mortgages.

142.     Defendants also breached the implied covenant of good faith and fair dealing by failing to timely discharge the liens even after Plaintiffs paid in full all amounts that Defendants alleged were owing under the Loan Documents.

143.     Defendants' misconduct is a material breach of the Loan Documents including, without limitation, the implied covenant of good faith and fair dealing.

144.     As a direct and proximate result of the foregoing, Plaintiffs have suffered damages which include, without limitation:  (i) the amount of the Additional Payment; (ii) additional damages in an amount to be determined at trial; and (iii) interest, costs, expenses and attorneys' fees.

### Fourth Cause of Action
### (Fraud)

145.     Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

146.     In its capacity as an agent of Lender, Wells falsely promised and/or represented to Plaintiffs, among other things, that Lender would not assert a default with respect to Plaintiffs' failure to pay off the Loans in full on or before the Maturity Date.

147.    Plaintiffs justifiably and foreseeably relied upon Wells' false promises and/or representations and were fraudulently induced to, among other things, forbear from paying off the Loans in full by the Maturity Date and to make additional payments of principal and interest that were not called for under the Loan Documents.

148.    At the time when Wells made such promises and/or misrepresentations, Wells and/or the other Defendants had a present intention not to perform.

149.    Further, Wells – acting in concert and coordination with the other Defendants – knew or had reason to know that the promises and/or representations it made to Plaintiffs were not true.

150.    Among other things, upon information and belief, Wells and CW Capital engage in wrongful behavior like that described in this complaint as a regular way of doing business. Wells routinely makes promises and assurances to borrowers in its role as the master servicer, inducing borrowers to commit a technical default, whereby CW Capital can then call said default and seek to collect exorbitant default interest and fees while refusing to honor the promises made by Wells.

151.    Defendants' fraudulent conduct is further evidenced by the substantial discrepancies between the CW Capital NC Payoff Statement and the Wells NC Payoff Statement, which related to the same loan and were generated one business day apart.

152.    As described above, the CW Capital NC Payoff Statement contained more than $55,000 in purported fees and expenses that were not reflected anywhere on the Wells NC Payoff Statement.

153.    Upon information and belief, Defendants knew or had reason to know that the additional fees and expenses contained in the CW Capital NC Payoff Statement (as well as the payoff statements provided by CW Capital with respect to the other two loans) were baseless.

154.    As a direct and proximate result of the foregoing, Plaintiffs have suffered damages in the amount to be determined by the Court, together with interest and counsel fees and all other costs and disbursements.

155.    Defendants' actions are wanton, willful and malicious.    Further, given Defendants' prominent roles in the lending industry, Defendants' egregious conduct is likely to be repeated with respect to other borrowers.   Therefore, Plaintiffs are also entitled to punitive and exemplary damages in an amount to be determined at trial.

**Fifth Cause of Action**
**(Violation of N.C.G.S.A. § 45-36.9)**

156.    Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

157.    Pursuant to Section 45-36.9 of the North Carolina General Statutes, "[a] secured creditor shall submit for recording a satisfaction of a security instrument within 30 days after the creditor receives full payment or performance of the secured obligation."

158.    Defendants violated this statute by failing to submit a satisfaction of the North Carolina Mortgage for recording within thirty days of July 1, 2017, when Plaintiffs made the Payments to Defendants.

159.    Alternatively, Defendants violated this statute by failing to submit a satisfaction of the North Carolina Mortgage for recording within thirty days of April 17, 2018, when Plaintiffs made the Additional Payment to Defendants.

160.     Defendants further violated the statute by failing to submit a satisfaction of the North Carolina Mortgage for recording within thirty days of the date when Plaintiffs made a written demand upon Defendants for same.

161.     Plaintiffs seek all available damages in an amount to be determined at trial, plus interest, punitive damages, and reasonable attorneys' fees and court costs.

### Sixth Cause of Action
### (Violation of 27 V.S.A. § 464)

162.     Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

163.     Pursuant to Title 27, Section 464 of the Vermont Statutes, "[w]ithin 30 days after full performance of the conditions of the mortgage, the mortgagee of record shall execute and deliver a valid and complete discharge as provided in sections 461-463 of this title, together with any instrument necessary to establish the mortgagee's record ownership of the mortgage and to establish the authority to execute the discharge."

164.     Defendants violated this statute by failing to submit a satisfaction of the Vermont Mortgage for recording within thirty days of July 1, 2017, when Plaintiffs made the Payments to Defendants.

165.     Alternatively, Defendants violated this statute by failing to submit a satisfaction of the Vermont Mortgage for recording within thirty days of April 17, 2018, when Plaintiffs made the Additional Payment to Defendants.

166.     Defendants further violated the statute by failing to submit a satisfaction of the Vermont Mortgage for recording within thirty days of the date when Plaintiffs made a written demand upon Defendants for same.

167.     Plaintiffs seek all available damages in an amount to be determined at trial, plus interest, punitive damages, and reasonable attorneys' fees and court costs.

### Seventh Cause of Action
### (Violation of 21 Pa. Stat. Ann. § 721-6)

168.     Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

169.     Pursuant to Title 21, Section 721-6 of the Pennsylvania Statutes, a mortgagee is required to present for recording a satisfaction of a mortgage within 60 days after the mortgagee receives payment in full of all amounts owed and written notice for the satisfaction piece.

170.     Plaintiffs paid all amounts justly due and owing on July 1, 2017.   Further, Plaintiffs provided written notice demanding the filing of a satisfaction piece by filing and serving the complaint in the prior action on July 6, 2017 (which sought, among other relief, an Order directing Defendants to file satisfactions of the Mortgages).

171.     Defendants violated this statute by failing to submit a satisfaction of the Pennsylvania Mortgage for recording within sixty days of July 6, 2017.

172.     Plaintiffs seek all available damages in an amount to be determined at trial, plus interest, punitive damages, and reasonable attorneys' fees and court costs.

### JURY DEMAND

Plaintiffs' demand a trial by jury of all issues so triable.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against each of the Defendants as follows:

> a. On the First Cause of Action, for an award of compensatory damages against Defendants in an amount to be determined at trial, plus interest, costs and attorneys' fees;

b. On the Second Cause of Action, for an award of compensatory damages against Defendants in an amount to be determined at trial, plus interest, costs and attorneys' fees;

c. On the Third Cause of Action, for an award of compensatory damages against Defendants in an amount to be determined at trial, plus interest, costs and attorneys' fees;

d. On the Fourth Cause of Action, for an award of compensatory and punitive damages against Defendants in an amount to be determined at trial, plus interest, costs and attorneys' fees;

e. On the Fifth Cause of Action, for an award of all damages available under N.C.G.S.A. § 45-36.9 and common law (including punitive or exemplary damages) in an amount to be determined at trial, plus interest, costs and attorneys' fees;

f. On the Sixth Cause of Action, for an award of all damages available under 27 V.S.A. § 464 and common law (including punitive or exemplary damages) in an amount to be determined at trial, plus interest, costs and attorneys' fees;

g. On the Seventh Cause of Action, for an award of all damages available under 21 Pa. Stat. Ann. § 721-6 and common law (including punitive or exemplary damages) in an amount to be determined at trial, plus interest, costs and attorneys' fees; and

h. For such other and further relief as this Court may deem just, and proper and equitable, together with an award of Plaintiffs' attorneys' fees, costs and disbursements of this action.

Dated: Uniondale, New York
July 23, 2018

WESTERMAN BALL EDERER
MILLER ZUCKER & SHARFSTEIN, LLP

By:_____
Jeffrey A. Miller
1201 RXR Plaza
Uniondale, New York 11556
(516) 622-9200
*Attorneys for Plaintiff*

1783006

24